# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY WAYNE BAKER, | : | Civil No. 3:16-cv-1612 |
| | : | |
| Petitioner | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, *et al.*, | : | |
| | : | |
| Respondents | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Petitioner Jeffrey Wayne Baker ("Petitioner" or "Baker"), a state inmate currently confined at the State Correctional Institution at Huntingdon, Pennsylvania, files the instant petition (Doc. 1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from convictions on twenty-nine counts of "sexual abuse of children – child pornography" in violation of 18 Pa.C.S. § 6312(d)(1), and one count of criminal use of a communication facility in violation of 18 Pa.C.S. §7512, entered in the Court of Common Pleas of Cumberland County in 2008. (Doc. 1; Doc. 5-4, p. 2). The petition is presently ripe for disposition. For the reasons set forth below, the petition will be denied.

## I.   State Court Background

Below is a comprehensive summary of the facts and procedural history contained within the Superior Court decision affirming the denial of Baker's petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 PA.C.S.A. §§ 9541-9546:

## Statement of Facts

On February 6, 2007, Detective Adam Shope of the East Pennsboro Police Department, Detective Earl Bock of the District Attorney's Office, along with several other officers, served a search warrant at 115 South Enola Drive in Enola, Pennsylvania. [Appellant], 34 year old Jeffrey Baker, resides at the address with his father, Jack Baker, and his stepmother, Ruth Murray. Officers were acting on cybertips reported through America Online's (AOL) legal department that identified [Appellant's] email account as containing images that appeared to be child pornography. Officers had a search warrant for [Appellant's] computer and other computer hardware, software, CDs, DVDs which they believed to contain child pornography. [Appellant] was naked in bed sleeping when officers arrived, and his laptop computer was on a table by the side of his bed.

[Appellant] told Detective Bock that he conducted web searches using the search term "anal gang bang" and downloaded files with names that led him to believe they were child pornography, and that he had downloaded files as recently as the night before the search warrant. [Appellant] told Detective Bock that he used emails and a file-sharing website to trade nude and non-nude images of children.

Detectives seized [Appellant's] computer and other evidence from the residence and left without arresting [Appellant] at that time. [Appellant] told detectives that they would find child pornography on the seized computer. [Appellant's] laptop computer was attached to a write-blocker, which is a device that prevents additional items from being added to the hard drive. The content was analyzed by the Pennsylvania State Police and by the National Children's Resource Center. [Appellant's] computer was found to contain 34 video files of child pornography. Additional child pornography files were found on two CD's seized from [Appellant's] bedroom. [footnote: The files that were opened contained images of children as young as two years old being sexually abused. The first report of Dr. Paula B. George, the medical director of Children's Resource Center of Pinnacle Health, stated, "Many of these video/movie clips are of pre-school aged children being subjected to sex acts including vaginal, anal, and oral penetration by adult males or females." Report, 6/1/08, at 2, Commonwealth Exhibit 19; N.T., 7/14/08, at 175.].

## Procedural History

A criminal complaint was filed on March 9, 2007, and [Appellant] was arrested on March 15, 2007. [Appellant] filed a Motion to Suppress on October 22, 2007. A hearing on the Motion was held before Judge J. Wesley Oler, Jr., on January 2, 2008. [Appellant's] motion was denied. A jury trial was then held on July 14 and 15, 2008. [Appellant] was found guilty of [twenty-nine counts of sexual abuse of children and one count of criminal use of communication facility] and was ordered to submit to an assessment by the Sexual Offender Assessment Board. A hearing was held on April 20, 2009, to determine [Appellant's] status as a Sexually Violent Predator. After the hearing and consideration of briefs submitted by the parties, the Court found [Appellant] to be a Sexually Violent Predator. On May 12, 2009, [Appellant] was sentenced to a term of state imprisonment for twenty-five to fifty years. This was the mandatory minimum sentence required under 42 Pa.C.S. §9718.2 and § 9795.1 of the Pennsylvania Sentencing Code.

[Appellant] appealed his case to the Superior Court of Pennsylvania. On June 27, 2011, in a published opinion, the Superior Court affirmed [Appellant's] judgment of sentence and found that he was properly determined to be a sexually violent predator. Commonwealth v. Baker, 24 A.3d 1006 (Pa. Super. 2011). [Appellant] then appealed this decision to the Supreme Court of Pennsylvania. On October 30, 2013, in a published opinion, the Supreme Court affirmed [Appellant's] twenty-five year mandatory minimum sentence for [Appellant's] second conviction of possessing child pornography. Commonwealth v. Baker, 78 A.3d 1044 (Pa. 2013).

[Appellant] filed this [timely] motion for Post-Conviction Collateral Relief pro se on March 6, 2014. [n.2 The Commonwealth stipulated at the PCRA hearing on April 2, 2015, that the PCRA petition was timely. N.T. (PCRA), 4/2/15, at 3.] Counsel was appointed to represent [Appellant] and he was allowed to file an amended petition. On October 6, 2014, this Court granted permission for [Appellant's] then PCRA counsel to withdraw. A new attorney was appointed to represent [Appellant] and he again was allowed permission to file an amended PCRA petition. On January 20, 2015, [Appellant] filed an Amended Post-Conviction Relief Act petition alleging ineffective assistance of trial counsel. The hearing on the PCRA petition was held on April 2, 2015. This Court denied [Appellant's] amended Post-Conviction Relief Act petition.

On May 1, 2015, [Appellant] filed a Notice of Appeal to the Superior Court of Pennsylvania of the denial of his Post-Conviction Relief Act petition. On May 4, 2015, the Court ordered that [Appellant] file a Concise Statement of Errors Complained of on Appeal on or before May 25, 2015. On May 21, 2015, [Appellant's] counsel filed a Statement of Intent to file an Anders/McClendon [Anders v. California, 386 U.S. 738 (1967); Commonwealth v. McClendon, 434 A.2d 1186 (Pa. 1981).] This statement of intent to file an Anders/McClendon brief was filed in lieu of filing a Concise Statement of Errors Complained of on Appeal. ["[I]n lieu of a Concise Statement, … counsel will file an Anders/McClendon brief in this matter. See Pa.R.A.P. 1925(c)(4)." PCRA Court Opinion, 6/9/15, at 4. The PCRA Court Opinion, therefore, does not address any issues.]

(Doc. 5-8, pp. 1-4, quoting PCRA Court Opinion, 6/9/15, at 1-4 (footnotes omitted).

On February 12, 2016, the Superior Court concluded that the issues raised in his PCRA lacked arguable merit. (Id. at p. 12).

Baker filed the instant petition on August 4, 2016.

## II.   Issues Presented for Federal Review

In Ground One, Baker challenges his sentence under the Eighth Amendment as cruel and unusual and grossly disproportionate. (Doc. 1, pp. 5, 6). In Ground Two, in addition to reiterating the challenge to the severity of his sentence, he contends that the sentence is in violation of the premise set forth in Alleyne v. United States, 570 U.S. 99 (2013), that any fact that increases the mandatory minimum sentence for a crime is an element that must be submitted to the jury. In Ground Three, he contends that trial counsel was ineffective in failing to call certain witnesses during the hearing in which he

sought to suppress evidence obtained during the search of his residence.

## III. **Discussion**

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a state prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973). Baker's case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"). 28 U.S.C. § 2254, provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> (b)(1) an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

>> (A) the applicant has exhausted the remedies available in the courts of the State;

>> ...

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.  Section 2254 clearly sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.  <u>Cullen v. Pinholster</u>, 536 U.S. 170, 181 (2011); <u>Glenn v. Wynder</u>, 743 F.3d 402, 406 (3d Cir. 2014).  A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts.

### A.    Exhaustion and Procedural Default

Habeas relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State," meaning a state prisoner must "fairly present" his claims in "one complete round of the state's established appellate review process," before bringing them in federal court.  28 U.S.C. § 2254(b)(1)(A); <u>see</u> <u>also</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999) (stating "[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . .  state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process."); <u>see</u> <u>also</u> <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971); <u>Lambert v. Blackwell</u>, 134 F.3d 506, 513

(3d Cir. 1997). The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner has exhausted a federal claim only if he or she presented the "substantial equivalent" of the claim to the state court. Picard, 404 U.S. at 278. To satisfy this requirement, a petitioner must "fairly present" his federal claim's "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." Robinson v. Beard, 762 F.3d 316, 328 (3d Cir. 2014); see Baldwin v. Reese, 541 U.S. 27, 29 (2004); see McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).

In his second ground, Baker expands his severity of his sentence claim contained in his first ground, which will be addressed on the merits *infra*, to include the argument that "the judge was not allowed by statute to impose any sentence other than what the DA asked for [t]aking away the power of the judge and placing it in the DA's hands alone. Re: Alleyne v. United States No. 11-9335 133 S.Ct. 2151 (2013)." (Doc. 1, p. 6). Respondents argue that Baker has procedurally defaulted this claim as he has failed to present it to the state courts. (Doc. 5, pp. 11, 12).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, [as is the case here,] the exhaustion requirement is satisfied because there is 'an

absence of available State corrective process.'  28 U.S.C. § 2254(b).  In such cases,

however, applicants are considered to have procedurally defaulted their claims and

federal courts may not consider the merits of such claims unless the applicant establishes

'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her

default.  See Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640

(1991)."  McCandless, 172 F.3d at 260.

To demonstrate "cause" for a procedural default, a petitioner must point to some

objective external factor which impeded his efforts to comply with the state's procedural

rule.  See Murray v. Carrier, 477 U.S. 478, 488 (1986).  "Prejudice" will be satisfied only

if he can demonstrate that the outcome of the state proceeding was "unreliable or

fundamentally unfair" as a result of a violation of federal law.  See Lockhart v. Fretwell,

506 U.S. 364, 366 (1993).  The fundamental miscarriage of justice exception is narrow.

'The Supreme Court has applied it 'to a severely confined category: cases in which new

evidence shows 'it is more likely than not that no reasonable juror would have convicted

[the petitioner].' ' McQuiggin, 133 S.Ct. at 1933 (alteration in original) (quoting Schlup,

513 U.S. at 329, 115 S.Ct. 851). Put differently, the exception is only available when a

petition presents 'evidence of innocence so strong that a court cannot have confidence in

the outcome of the trial unless the court is also satisfied that the trial was free of

nonharmless constitutional error.' Id. at 1936 (quoting Schlup, 513 U.S. at 316, 115 S.Ct.

851). In Schlup, the Supreme Court emphasized that "[w]ithout any new evidence of

innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." 513 U.S. at 316, 115 S.Ct. 851." <u>Coleman v. Greene</u>, 845 F.3d 73, 76 (3d Cir. 2017).

Baker concedes the default. (Doc. 9, pp. 2, 5). He seeks to overcome it by invoking the fundamental miscarriage of justice exception. He specifically argues that "Is it not a miscarriage of justice to illegally imprison someone for far more years than deserved? Does that alone not demonstrate cause in itself. 50 years your Honor. The statutory max for my crime is 10 years. I am doing 5 that." (<u>Id.</u> at 6). This argument in no way satisfies the requirement that, in order to satisfy the fundamental miscarriage of justice exception, he bring forth new evidence of innocence that shows that it is more likely than not that no reasonable juror would have convicted him. Because Baker cannot overcome the procedural default of this claim, federal review is unavailable.

**B.     Claims Adjudicated on the Merits by the State Courts**

Under the AEDPA, federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"[B]ecause the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction," Greene v. Fisher, 565 U.S. 34, 38 (2011) (internal quotations and citations omitted), "[t]his is a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt." Cullen, 563 U.S. at 181(internal quotation marks and citation omitted). The burden is on Baker to prove entitlement to the writ. Id.

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "[A] state court decision reflects an 'unreasonable application of such law' only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents,' a standard the Supreme Court has advised is 'difficult to meet' because it was 'meant to be.' [Harrison v.] Richter, 562 U.S. 86, [ ] 102, 131 S.Ct. 770. As the Supreme Court has cautioned, an 'unreasonable application of federal law is different from an incorrect application of federal law,' Richter, 562 U.S. at 101, 131 S.Ct.

770 (quoting <u>Williams</u>, 529 U.S. at 410, 120 S.Ct. 1495), and whether we 'conclude[ ] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly' is irrelevant, as AEDPA sets a higher bar. <u>Williams</u>, 529 U.S. at 411, 120 S.Ct. 1495." <u>Mathias</u>, 876 F.3d at 476. A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

Finally, Section 2254(e) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

    1.    <u>Ground One</u>

Baker seeks relief on the ground that his "[s]entence is cruel and unusual and grossly disproportionate." (Doc. 1, p. 5). He challenges Pennsylvania's "blanket law" that punishes all offenders regardless of severity of offense. (<u>Id.</u>). He takes issue with his twenty-five year mandatory minimum sentence "for mere possession while the actual perpatraitor [sic] would receive the same or lessor sentence," and criticizes the state's mandatory minimum sentencing structure. (Doc. 1, p. 5; Doc. 9, p. 4). He also argues that the state has failed to acknowledge that his sentence is not merely twenty-five years;

"[i]t is 50 years, the equal of 2 life sentences in many states." (Doc. 9, p. 4). He

indicates that the briefs filed in the state courts "lay out [his] argument very well." (Doc.

1, p. 6). Baker raised the issue during his direct appeal proceedings.

The Eighth Amendment to the United States Constitution provides that

"[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted." U.S. Const. amend. VIII. The "cruel and unusual

punishments" clause "prohibits not only barbaric punishments, but also sentences that are

disproportionate to the crime committed." Solem v. Helm, 463 U.S. 277, 284 (1983); see

also Hermelin v. Michigan, 501 U.S. 957, 1001 (1991) ("[T]he Eighth Amendment does

not require strict proportionality between crime and sentence. Rather, it forbids only

extreme sentences which are grossly disproportionate to the crime."); Ewing v.

California, 538 U.S. 11, 20 (2003) (The "Eighth Amendment, which forbids cruel and

unusual punishments, contains a narrow proportionality principle that applies to non-

capital sentences.").

A court must consider three proportionality factors when evaluating Eighth

Amendment challenges to a sentence: (1) the gravity of the offense and the harshness of

the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3)

the sentences imposed for commission of the same crime in other jurisdictions. Solem,

463 U.S. at 290–92. Recidivist sentences only violate the Eight Amendment's

prohibition against cruel and unusual punishment in those extremely rare and

extraordinary cases where the threshold comparison between "the crime committed and the sentence imposed leads to an inference of gross disproportionality." Ewing, 538 U.S. at 30; Lockyer v. Andrade, 538 U.S. 63, 72 (2003). Successful proportionality challenges in non-capital cases are "exceedingly rare." Ewing, 538 U.S. at 21 (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)).

In considering the issue of whether Baker's "25-year mandatory minimum sentence of imprisonment imposed for Appellant's second conviction of possessing child pornography is grossly disproportionate to the crime and, therefore, unconstitutional" the Pennsylvania Supreme Court set forth the following pertinent background:

> Appellant was first convicted of possession of child pornography in 2001. That conviction resulted in a sentence of five years' intermediate punishment which Appellant completed in September 2006. In January 2007, the police received a cyber-tip from the National Center for Missing and Exploited Children that Appellant had sent and received images of child pornography by computer. A search warrant was issued for computers and related items located in Appellant's residence. The evidence seized from Appellant's bedroom as a result of the search included a computer and multiple DVDs containing dozens of video clips and hundreds of photographs of children engaging in sex acts. Subsequent forensic analysis showed that the computer had been used to share this illicit material online. Appellant was arrested and arraigned on child pornography charges, and the Commonwealth, although not required to do so at that point in the proceedings, informed Appellant that if convicted, he would be subject to a 25-year mandatory minimum sentence under the provisions of the Sentencing Code, 42 Pa.C.S. §§ 9701-9799.9, at Section 9718.2 (Sentences for sex offenders). [n. 1 Section 9718.2 sets a mandatory minimum prison term of 25 years if the defendant is convicted of one of the sexual offenses under Section 9795.1 which require registration with the state police, and if the defendant had previously been convicted of an offense under Section 9795.1. A violation of Section 6312 of the Crimes Code relating to sexual abuse of children includes the possession of child

pornography and is an enumerated offense under Section 9795.1 requiring registration with the state police.].

At Appellant's jury trial, the Commonwealth introduced into evidence 29 separate video clips of children engaging in sex acts that had been recovered from the DVDs and computer seized from Appellant's residence. For each clip, the Commonwealth presented corresponding expert testimony that at least one of the persons seen engaging in sex was less than eighteen years of age. The videos were graphic, and a number of them showed very young children, some of whom appeared to be toddlers, being anally and/or vaginally raped by adult men. The jury convicted Appellant of 29 counts of "sexual abuse of children – child pornography," 18 Pa.C.S. § 6312(d)(1), and one count of criminal use of a communication facility, 18 Pa.C.S. §7512. [footnote omitted].

Following conviction but before sentencing, the Commonwealth gave Appellant and the court formal notice of its intention to proceed under the mandatory minimum sentencing provisions set forth at Section 9718.2. The court ordered a pre-sentence investigation and a hearing to determine whether Appellant was a sexually violent predator ("SV") pursuant to Section 9795.4. At the SVP hearing, the Commonwealth presented evidence that Appellant had sent instant messages on the computer seized from his bedroom, attempting to solicit adult women in the Philippines to commit sex acts upon children at his direction while he watched via live web-cam. A member of the Sexual Offender's Assessment Board testified that in his opinion, Appellant met the diagnostic criteria for pedophilia and the legal criteria to be deemed an SVP. Thereafter, the court determined that Appellant was an SVP, and sentenced him to 29 concurrent mandatory terms of 25 to 50 years' imprisonment for his convictions of sexual abuse of children – child pornography, and a concurrent sentence of 1 to 7 years' imprisonment for his conviction of criminal use of a communication facility. The court also ordered that Appellant be subject to lifetime registration with the state police under Section 9795.1(b)(3).

Appellant appealed to the Superior Court, claiming, inter alia, that his sentence under Section 9718.2 violated the prohibition against "cruel and unusual punishments" contained in the Eighth Amendment of the United States Constitution, and the prohibition against "cruel punishments" contained in Article 1, Section 13 of the Pennsylvania Constitution. The Superior Court affirmed the judgment of sentence, and determined, as a

threshold matter with respect to Appellant's constitutional challenge, that Appellant had failed to show that the length of his sentence raised an inference of gross disproportionality when compared to the gravity of his crime. Commonwealth v. Baker, 24 A.3d 1006, 1029 (Pa.Super. 2011). This Court granted allowance of appeal to address whether Section 9718.2 of the Sentencing Code, mandating a mandatory minimum sentence of imprisonment for offenders who have twice been convicted of possessing child pornography, is grossly disproportionate to the crime and, therefore, unconstitutional. [footnote omitted].

(Doc. 5-4, pp. 1-4). In considering the issue, the Supreme Court recited the following applicable constitutional standards of review:

"The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences which are grossly disproportionate to the crime." Commonwealth v. Hall, 701 A.2d 190, 209 (Pa. 1997) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)). There is no prior decision from this Court addressing challenges to non-capital mandatory recidivist sentencing statutes under the Eighth Amendment or Article I, Section 13.

In Commonwealth v. Spells, 612 A.2d 458, 462 (Pa. Super. 1992) (en banc), the Superior Court applied the three-prong test for Eighth Amendment proportionality review set forth by the United States Supreme Court in Solem v. Helm, 463 U.S. 277, 292 (1983), and determined that a five-year mandatory minimum sentence for offenses committed with a firearm does not offend the Pennsylvania constitutional prohibition against cruel punishments. The Spells court observed that the three-prong Solem proportionality test examines: '(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Spells, 612 A.2d at 462 (quoting Solem, 463 U.S. at 292). The Spells court correctly observed that a reviewing court is not obligated to reach the second and third prongs of the test unless 'a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' Spells, supra at 463 (quoting the controlling opinion of Justice Kennedy in Harmelin, supra at 1005). [n.4 Justice Kennedy's understanding of the first prong of the Solem test as a threshold hurdle in establishing an Eighth Amendment violation has been

recently cited with approval by the High Court as well. "A court must begin by comparing the gravity of the offense and the severity of the sentence." <u>Graham v. Florida</u>, 130 S.Ct. 2011, 2022, — U.S. —, — (2010). In the "rare case" in which this threshold comparison leads to an inference of gross disproportionality, the reviewing court "should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." <u>Id.</u> "If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." <u>Id.</u>, quoting <u>Harmelin</u>, <u>supra</u> at 1005.].

(Doc. 5-4, pp. 4, 5).

In considering the gravity of the offense of possession of child pornography, the Supreme Court outright rejected Baker's argument that the offense is a simple, non-serious, possessory offense and, instead, found it to be "very serious and grave." (Id. at pp. 12, 13). The court considered a multitude of factors such as governments' objectives of preventing the sexual exploitation and abuse of children, the victimization of children, the permanency of the images, and the role the offense plays in enabling sexual crimes against children and contributing to the production of child pornography. (<u>Id.</u> at pp. 10-13). The court then compared the gravity of the offense to the punishment imposed and observed that "[t]his is an indeterminate sentence of years with the possibility of parole at some point following the expiration of the mandatory minimum sentence. While clearly a lengthy sentence, the sentence here is not tantamount to a life sentence without the possibility of parole which the High Court struck down in <u>Solem</u>, <u>supra</u>, as grossly disproportionate to the recidivist non-violent offense of passing a bad check in the amount of $100." (<u>Id.</u> at 13). The court then concluded that "a threshold comparison of

16

the gravity of the second conviction of possessing and viewing child pornography against the imposition of a mandatory sentence of at least 25 years' imprisonment does not lead to an inference of gross disproportionality.   Thus, we need not reach the second and third prongs of the test for proportionality review under the Eighth Amendment…" (Id. at 13, 14).

The state court's determination is in accordance with, and a reasonable application of, Supreme Court Eighth Amendment jurisprudence.  Hence, Baker's Eighth Amendment challenge to the proportionality and severity of his sentence is without merit.

2.    Ground Three

Nor is he entitled to relief on the ineffective assistance of counsel claim.  The Superior Court applied the following standard of review to its analysis of  Baker's ineffective assistance of trial counsel claims:

> To plead and prove ineffective assistance of counsel, a petitioner must establish:  (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act.  Commonwealth v. Stewart, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*).  Failure to establish any one of these prongs will defeat an ineffectiveness claim.  Mason, — A.3d — , —, 2015 WL 9485173 at *7.  Counsel is presumed to have rendered ineffective assistance of counsel.  Commonwealth v. Montalvo, 114 A.3d 401, 410 (Pa. 2015).  We have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim.  Commonwealth v. Loner, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

(Doc. 5-8, p. 8).

The clearly established Federal law governing ineffective assistance of counsel claims, as determined by the Supreme Court of the United States is as follows:

> Ineffective assistance of counsel claims are "governed by the familiar two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." <u>Shelton v. Carroll</u>, 464 F.3d 423, 438 (3d Cir. 2006) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). For AEDPA purposes, the <u>Strickland</u> test qualifies as "clearly established Federal law, as determined by the Supreme Court." <u>Williams</u>, 529 U.S. at 391, 120 S.Ct. 1495. Under <u>Strickland</u>, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. 466 U.S. at 687, 104 S.Ct. 2052. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Id.</u> at 688, 104 S.Ct. 2052. This review is deferential:

> > A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

> <u>Id.</u> at 689, 104 S.Ct. 2052

> Not every "error by counsel, even if professionally unreasonable, ... warrant[s] setting aside the judgment of a criminal proceeding." <u>Id.</u> at 691, 104 S.Ct. 2052. "Even if a defendant shows that particular errors of counsel were unreasonable, ... the defendant must show that they actually had an adverse effect on the defense"; in other words, the habeas petitioner must show that he was prejudiced by counsel's

deficient performance. Id. at 693, 104 S.Ct. 2052. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052.

In assessing an ineffective assistance of counsel claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding.... In every case the court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Id. at 696, 104 S.Ct. 2052.

Rainey v. Varner, 603 F.3d 189, 197–98 (3d Cir. 2010). The Third Circuit has specifically held that the very ineffectiveness assistance of counsel test relied upon by the Superior Court in considering the PCRA appeal is not contrary to the Supreme Court's Strickland standard. See Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).

When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). "And, because the Strickland standard is a general standard, a state court has even

more latitude to reasonably determine that a defendant has not satisfied that standard." Id.

Baker contends that counsel was ineffective in his quest to suppress evidence seized during the search of his residence. (Doc 1, p. 8). He states "[a] 4 corners argument was made, however [counsel] failed to fully express my argument. A search warrant was served upon me with only an anonymous tip. Det. Bach [sic][1] stated in his affidavit for probable cause that 'Baker' accessed the IP address listed and sent pictures deemed to be illegal. The State Police Forensic analyst stated that was not accurate[,] only that someone accessed the IP address listed and it could not be determined to be me. Still, Bach [sic] listed my name in the search warrant. I had wireless unsecured internet anyone could have accessed it within a set distance from my home, furthermore other people in the home also had access." (Id.). During the PCRA proceedings, Baker challenged counsel's failure to call certain witnesses at the suppression hearing. He argued that counsel was ineffective for failing to call his father and stepmother to testify that there was more than one computer in the home connected to the internet, that he was not informed that he was not under arrest, and that he did not feel he was free to leave. (Doc. 5-8, p. 8). He also took issue with counsel's failure to call a computer expert to testify regarding the accessibility of the IP address.

---

[1] According to state court documents, the detective is properly identified as "Bock."

In considering the issue, the Superior Court relied on Pennsylvania Supreme Court precedent which dictates that, "to prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, an appellant must prove: '(1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant.' Commonwealth v. Chmiel, 889 A.2d 501, 545-546 (Pa. 2005))." (Doc. 5-8, p. 10). The court emphasized that "[t]rial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witness's testimony would have been beneficial or helpful in establishing the asserted defense." (Id. at 10, citing Chmiel, 889 A.2d at 545-546).

In finding that "[t]he reasons asserted by [Baker] regarding the value of the testimony do not support the conclusion that the witnesses' testimony would have been beneficial[,]" the court noted that neither Baker's father nor stepmother could testify regarding whether he "felt free to leave at the time police conducted their search." (Id. at 10). The court further noted that their testimony would have been "merely cumulative," and that Baker testified at the suppression hearing that his father had a computer and police had moved it from the 'computer room' to the living room." (Id. at 11, citing suppression hearing transcript).

These conclusions are supported by the record.  At the suppression hearing, Baker testified that on February 6, 2007, a search warrant was executed at his residence located at 115 South Enola Drive, Enola, Pennsylvania at approximately 2:30 p.m.  (Doc. 5-1, p. 105).  At the time he was sleeping naked in his bed.  (Id. at 106).  He was informed by Detective Bock that he had a search warrant to collect his computer.  (Id. at 119).  He left the bedroom and was in the hallway when he experienced weakness in his knees and fell to the ground.  (Id. at 107, 108).  From there he crawled into the bathroom.  (Id. at 108).  Police officers then grabbed him by each elbow and dragged him to the kitchen and laid him on the floor.  (Id.).  After about forty-five minutes on the floor, he voluntarily made his way into the dining room.  (Id. at 112).  From the dining room, he noticed that the police officers had placed on the living room floor his computer, which was removed from his bedroom, and his father's computer, which was removed from the home "computer room."  (Id. at 112-114).  He testified that he asked Detective Shope "why are you taking [my father's] stuff, he had nothing to do with this," and that the detective directed him to speak with Detective Bock and told him that if he cooperates "they might let you keep your dad's computer."  (Id.).  Baker testified that he sat at the dining room table and answered questions posed by Detective Bock.  (Id. at 115, 116).  He testified that during the search, he was not told he was in custody and was not told he was under arrest.  (Id. at 108, 109, 120).  He was also not told he was not in custody or that he was free to go.  (Id. at 114, 116).  After questioning concluded, at approximately 3:30,

Detective Bock told him he was not under arrest, advised him if he was not able to remain in the house because of the situation, or planned on leaving town, he should let the detective know. (Id. at 117, 124).

With regard to his suppression hearing testimony concerning the other adults residing in the home, he stated that his father "doesn't get home from work until 3," and that he did not see or have any interaction with his father until after the search, as he was seated on the couch in the living room. (Id. at 122-124). His father's computer was not seized as evidence as a result of the search. (Id. at 124). His stepmother brought the officers to his bedroom door. (Id. at 124). He saw her in the kitchen and living room during the search but did not interact with her. (Id.).

His PCRA hearing testimony essentially mirrored that offered at the suppression hearing. Baker also testified that his stepmother and a police officer came to his bedroom door at approximately 2:30 p.m. (Doc. 5-7, pp. 20, 21). His stepmother then purposely went into a different room "as she did not want to know what was going on." (Id. at 20, 21, 32). At the time, he was taking a nap and was naked. (Id. 20, 22). He put on a bathrobe and, after recovering from temporary disabling numbness in his legs due to a recent cortisone shot, he voluntarily made his way to the dining room to answer questions. (Id. at 21, 25, 28). He was in the dining room being interviewed by two police officers when his father arrived. (Id. at 21). He was not advised as to whether he was free to leave the premises, but felt he was not. (Id. at 22, 26). Even if he was free to

leave, he had no clothes. (Id. at 26). He further testified that there were three exits to the

home and that police officers would not let anyone go in the hallway that led to the main

entrance of the home and were posted at the other two exits of the home. (Id. at 26). He

acknowledged that he was in his home, not a police station, that he was not handcuffed,

and that, for the most part, the officers were courteous. (Id. at 26, 27). He also testified

that other family members residing in the home possessed computers. (Id. at 23).

Baker's father, Jack Baker, also testified at the PCRA hearing. He indicated that

he retained Attorney Charles Mackin ("Attorney Mackin") to represent his son at trial.

(Id. at 11). Attorney Mackin had his contact information and he and Attorney Mackin

had what he described as free communications throughout the case. (Id.). He stated that

he was aware of the suppression hearing and available to testify but he did not attend

because he had not been "invited." (Id. at 12). With regard to the search, he testified

that, when he arrived at his home, there were officers at every door and three or four in

the living room. (Id. at 10). Officers informed him that they were questioning his son,

"doing an investigation in his [son's] bedroom" and told him that, so as not to hinder

their investigation, he could not proceed beyond the living room. (Id. at 13, 14). His son

was sitting at the dining room table in his bathrobe, and there was a Pennsylvania State

Trooper and a Pennsylvania State Police Investigator questioning him. (Id. at 12, 13).

He questioned why his computer was also in the living room and requested to sit with his

son during questioning.  (Id. at 14).  A State Trooper denied his request to sit with his son

during questioning.  (Id.).  He acknowledged that his son was an adult.  (Id. at 18).

Attorney Mackin testified at the PCRA hearing concerning his decision not to call

Baker's father or stepmother at the suppression hearing.  He indicated that although he

had many conversations with Jack Baker, he did not speak with him concerning what he

witnessed and observed on the day of the search because he " knew from [his]

investigation and reading the report and speaking to Jeff that Jack was not there.  The

search went down around two o'clock in the afternoon and Jeff's father didn't get home

until sometime after 3.  The search ended about 2:30, no, 3:30, quarter of four."  (Id. at

36, 37).  Further, he testified that "after Jeff testified at the suppression hearing, I know

Jeff's father was in the courtroom, Jack and I conferred, and we both agreed that Jeff's

testimony went as good as it was going to go and we were not going to call anybody else.

And Jeff concurred in that."  (Id.)  As concerns Baker's stepmother, Attorney Mackin

wrote the following memo to his file on December 31, 2007:

> On this date I spoke by phone on two occasions to Ruth Murray, stepmother
> of Jeff.  I was calling to get her recollection of that day the police executed a
> search warrant on the house.  She said that due to the medication she takes
> she has no short term memory.  Specifically she does not remember much
> about the day in question.  Upon questioning, she remembered some things.
> She said she did not remember Jeff being naked.  Not sure if he was wearing
> robe or clothes.  Remembers answering the door and getting served with
> warrant.  She took police back to Jeff's room.  She was in a different room
> than Jeff while he was being questioned.  She did this on purpose as she did
> not want to know what was going on.  She did not hear what was being said
> to Jeff.  Remembers police telling her that she was not under arrest and that

she could go.  Jeff told me that neither he nor his stepmother were told they
were not under arrest and could go.  Murray recalls it differently and would
not help the case if she testified.

(Id. at 32).

In turning to the issue of the lack of computer expert testimony at the suppression

hearing, the Superior Court found that an expert was not needed to provide the

information Baker sought and emphasized that, during the suppression hearing, his

counsel extracted from the Commonwealth's witness, that "anybody in the house that's

on the computer would be working on that IP address."  (Doc. 5-8, pp. 11, 12, citing N.T.

(PCRA), 4/2/15 at 18).[2]

It is clear from a reading of the suppression hearing transcript that Attorney

Mackin thoroughly explored the issue of the accessibility of an IP address with the

Commonwealth's witness, the investigative analyst for the Delaware County Criminal

Investigation Division and, as noted by the Superior Court, established that the IP address

---

[2] In citing to the case of Concentric Network Corp. v. Commonwealth of PA, 877 A.2d 542, 544-45 (Pa.
Cmwlth. 2005), the Superior Court described an IP address as follows:  "In order for computer to
communicate with each other over the Internet, protocols know as Transmission Control Protocol/Internet
Protocols (TCP/IP) must be employed. Protocols are a specific set of rules or procedures that allow
[]computers to understand each other.  Each computer that is equipped to operate on the Internet used the
TCP which breaks the information being sent into tiny data packets and tags each packet with instructions
for how to assemble the information in a coherent form.  Each computer's IP then tags each data packet
with a destination IP address and a return IP address to allow the information to reach its intended
destination and to be responded to.  After an end user's data has been broken down, tagged and addressed
by TCP/IP, that end user's computer transmits the data to the ISP, which reroutes it for delivery to the
ultimate destination."  (Doc. 5-8, p. 9,  n.8).

was not particular to an individual or single computer.[3]  (Doc. 5-1, pp. 35, 52-66).  Also,

included in the PCRA hearing transcript is the following memorandum to the Baker file,

authored by Attorney Mackin:  "On 12/27/07 spoke with John Miller Computer Works

regarding the report made by the analyst B. Hunt in this matter.  I was particularly

interested in a portion of the report where Hunt says suspect accessed computer, et cetera.

Miller says no way such could be said with accuracy as there is no way of knowing who

accessed the computer, just that someone did and name was used.  Told him it was about

a child porn case and that I could bring the report, et cetera, over to him to review.  He

said no, he would rather come over to my office on Thursday, 12/27/07.  I call him on

Thursday, no answer, and he has not called back.  Told this to Jeff when we met today at

CCP.  This was my attempt to get an expert because Jack Baker, Jeff's father said to keep

expenses down."  (Doc. 5-7, p. 33).  In addition, Attorney Mackin offered the following

testimony at the PCRA hearing:

> Q.  Mr. Mackin, did you have conversation with the defendant's father, Jack Baker, about whether or not to hire this expert?
>
> A.  Yes.  We had discussed this, that I thought I needed an expert.  It was my idea.  And Jeff's father said, see what you can do, but keep the expenses down.
>
> Q.  Okay.  And then ultimately did you have that expert testimony?
>
> A.  No.

---

[3] The Delaware County Criminal Investigative Division serves as an Internet Crimes Against Children task force center, which investigates reports from the National Center for Missing and Exploited Children. (Doc. 5-1, pp. 37, 38).

Q. And why was that?

A. Well, because [the computer expert] never got back to me. He never showed up on that date in question. And I had the information and I knew what I needed to do with Hunt when he testified.

Q. And by that, by the information, it was the specific line in the search warrant when it said that Jeff Baker accessed the computer. But there was no way of knowing who actually accessed the computer. Is that right?

A. Right. I brought that out during Hunt's cross examination during our suppression hearing.

Q. And that, and that issue you actually or was taken up on appeal to the Superior Court. Is that correct?

A. I believe it was, yes.

(Doc. 5-7, pp. 34, 35).

The Superior Court concluded, "[t]rial counsel's failure to call [these witnesses] did not constitute ineffective assistance absent some showing that their testimony would have been beneficial. Trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. Loner, 836 A.2d at 132." (Doc. 5-8, pp. 11, 12Id.) It is evident from the foregoing that the Superior Court reasonably concluded that the underlying claim challenging counsel's failure to call certain witnesses at the suppression hearing had no merit. Because "counsel cannot be deemed ineffective for failing to raise a meritless claim," the Superior Court's determination that Baker was not entitled to relief on the ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of Strickland. See Werts, 228 F.3d at 203. In addition, the testimony elicited at the suppression and PCRA hearings demonstrates that the Superior Court's decision

was based on a reasonable determination of the facts in light of the evidence presented in the State court proceedings.

## IV.  Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003). Baker fails to demonstrate that a COA should issue.

The denial of a certificate of appealability does not prevent Baker from appealing the order denying his petition so long as he seeks, and obtains, a certificate of appealability from the Third Circuit Court of Appeals.  See FED. R. APP. P. 22(b)(1).

## V.  Conclusion

For the reasons set forth above, the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 will be denied.

A separate Order will enter.

BY THE COURT:

**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

**Dated:**     April 30, 2019